**Source Healthcare Analytics, Inc. v. SDI Health LLC**

*Howard D. Scher, Richard M. Simins* and *David A. Schumacher*, for plaintiffs.

*Barbara W. Mather, Barak A. Bassman, Sara B. Richman, Jeffrey L. Vagle, William Liess* and *Michael E. Baughman*, for defendants.

MCINERNEY, *J.*, January 14, 2014—

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Parties

1. Plaintiff Source Healthcare Analytics, Inc. ("SHA"), Defendant SDI Health LLC ("SDI") and defendant IMS Health, Inc. ("IMS") were competitors in the healthcare informatics industry at all times relevant herein. N.T. 9/23/13 a.m. p. 13-14 (Satin).

2. SHA was a provider of information services. N.T. 9/23/13 a.m. p. 12 (Satin). SHA bought data from pharmacy chains, other retailers and insurance providers, analyzed that data and created products which it sold to various customers primarily in the pharmaceutical industry. *Id.* p. 14-15.

3. In 2006, SHA was acquired by plaintiff WK Pharma for approximately $400 million. *Id.* p. 13.

4. WK Pharma is a subsidiary of WK US and a sister entity of WK Health. *Id.* p. 12.

5. Elizabeth Satin ("Satin") is the head of Mergers and Acquisition for WK U.S. at all times relevant hereto. N.T. 9/23/13 a.m. p. 4(Satin).

6. Robert Becker ("Becker") is the CEO of WK Health

at all times relevant hereto. N.T. 9/24/13 a.m. p. 4 (Becker).

7. Defendant SDI Holdings, Inc. was a private company also in the health care analytics industry.

8. Andrew Kress ("Kress") is the founder and president and CEO of SDI at all times relevant hereto. N.T. 9/24/13 a.m. p. 28 (Kress); D-395-100000011.

9. SDI Holdings Inc. was a wholly-owned subsidiary of SDI Health Holdings LLC. N.T. 9/26/13 p.m. p. 87 (Spaniel).

10. SDI Health Holdings LLC is owned by SDI Holdings Inc., LLR Equity Partners II, LLR Equity Partners III and Tailwind. N.T. 9/25/13 a.m. p. 38-39 (Kress).

11. Howard Ross ("Ross") and David Reuter ("Reuter") are principals at LLR Equity Partners Inc. at all times relevant hereto.

12. In 2008, SDI acquired Verispan, a competitor in the industry. N.T. 9/18/13 p. 114-115 (Reuter).

13. Defendant IMS was another competitor in the healthcare informatics industry at all times relevant hereto.

II. SDI expressed no interest in SHA prior to January 2010.

14. In 2009, WK began to explore ways to make SHA a stronger player in the market to better compete with IMS. N.T. 9 /23/13 a.m. p. 20-22 (Satin).

15. In October 2009, Satin, head of Mergers and Acquisition for WK US, and Becker, CEO of WK Health, arranged a meeting with Kress, CEO of Defendant SDI, and Ross and Reuter, principals at LLR Partners, Inc., to explore whether SDI was interested in doing any kind of deal that might enable SHA and SDI to better compete

against IMS. N.T. 9/23/13 a.m. p. 30, 39 (Satin).

16. At the meeting, Becker made a presentation about SHA's business. Becker explained that SHA had been struggling for several years and was a "challenged investment" largely due to the loss of its biggest client, Pfizer, which had accounted for approximately $30 million of its annual revenue. N.T. 9/23/13 a.m. p. 18-19, 31 (Satin).

17. Becker also explained that outside forces affected SHA's profitability, including the consolidation of companies within the pharmaceutical industry and the "patent cliff", the phenomenon occurring at the time in which more drugs were going off patent than coming on patent. N.T. 9/23/13 a.m. p. 18-19, 31 (Satin).

18. After the meeting, Kress, Ross and Reuter made it clear to WK that they had no interest in doing a transaction with WK. N.T. 9/23/13 a.m. p. 32 (Satin).

19. On November 25, 2009, Ross was invited to a breakfast meeting with William Nelligan, the President of the Americas of IMS. Nelligan requested the meeting to keep the lines of communication open between IMS and the SDI defendants. PX 2. At the breakfast, Nelligan warned Ross that if SDI and SHA "ever team up" antitrust rules would preclude an eventual marriage between SDI and IMS. *Id.* Later, Ross reported to Kress and Reuter as follows: "I'm sure Bill will ask for these breakfasts every 6 months so he can position IMS to acquire SDI if and when we are ready." *Id.*

### III. Rumors of SHA sale.

20. WK engaged William Blair & Company, LLC, ("Blair"), an investment banking firm, to run a limited auction process. N.T. 9/23/13 a.m. p. 22-23 (Satin).

21. In January 2010, Blair generated a list of thirty potential financial investors for SHA. This list did not include SDI. D-0036 at SHA003953; N.T. 9/23/13 a.m. p. 23-25, 30 (Satin).

22. After consulting with WK, Blair narrowed the list of potential investors down to six. The list included, Symphony Technology Group as a potential investor. N.T. 9/23/13 a.m. p. 25-30 (Satin).

23. Rumors about WK shopping the SHA asset surfaced in the industry. N.T. 9/18/13 a.m. p. 102-106 (Reuter); N.T. 9/19/13 p.m. p. 14-15 (Reuter); N.T. 9/25/13 p.m. p. 41-44 (Kress).

24. As a result of the rumors, Kress prepared a Power Point slide presentation for the SDI Board entitled "Project Hadron." Project Hadron was SDI code for a potential SHA/SDI combination. One of the benefits of combination with SHA identified by Kress on the power point slide was a long term IMS/TPG reaction. PX 4-LR02048; N.T. 9/25/13 p.m. p. 140-41(Kress).

25. Even though SDI stated they were not interested in any kind of transaction with SHA in October 2009, on January 20, 2010, Reuter wrote to Satin to express interest in a potential SHA/SDI merger stating: "We've heard rumors" that SHA "might be up for sale," and then went on to state, "I wanted to check in to see if there was any truth to that and express our interest in doing something one-off if you were interested in parting with it." D-00035.

26. Satin responded by leaving Reuter a voicemail, "saying there was nothing going on — was just rumors as usual." PX005 at SHA0027755; D-0035; N.T. 9/23/13 a.m. p. 34 (Satin).

27. The rumors continued. N.T. 9/19/13 p.m. p. 14-15

(Reuter).

28. On March 4, 2010, Reuter called Satin and again expressed interest in doing a deal as a standalone private equity firm or together with SDI. Satin asked: "what was the difference now vs. when we talked face to face a few months back." PX-5- SHA0027755. Reuter responded, "We had a chance to really think about it and thought it made a lot of sense." *Id.*

29. On March 30, 2010, Reuter emphasized the potential synergies of a combined SDI/SHA.

30. On April 26, 2010, Reuter and Satin spoke once again and reiterated his interest in a deal with SHA wherein he described his vision for the potential deal structure with SHA. Satin later relayed SDI's interest to her SHA team and Reuter's suggestions to exchange information that would allay SHA's concerns about SDI. PX-5; PX-6.

31. On May 6, 2010, SDI, WK and LLR executed a confidentiality agreement.[1] The parties agreed to furnish information[2] to each other, subject to the terms of the letter agreement, to assist the other in making an evaluation with regard to a possible transaction between the parties and to keep all information of the other party in confidence and not disclose it and use it solely for the purposes of evaluation. PX011.

32. The confidentiality agreement also prohibited the

---

1. The parties agreed that the confidentiality agreement would be governed by the laws of the State of Illinois. PX-11 par. 12(c).

2. Information was defined by the confidentiality agreement as "All information that is confidential, proprietary or generally not available to the public and that is provided or made available...in connection with the evaluation or negotiation of a potential transaction, whether furnished before or after the date of this letter agreement, whether or not labeled or otherwise identified as confidential regardless of the form or format of the information..." PX-1 1 par. 2.

parties from disclosing to any person any information with respect to "the fact, nature or status of any discussions among the parties, or any other facts or information with respect to the nature, terms or status of any transaction among the parties." PX-11 par. 3(d)(ii) (iii).

33. Upon the termination of the evaluation or the discontinuation of any discussions among the parties or at the other party's request, each party will, at its election, return or destroy other Party's information. PX- 11 par 5.

34. The confidentiality agreement contained an exception for any portions of information "which are or become generally available to the public through no direct or indirect act or omission by the receiving party or any of its representatives," "are already known by, or are or become lawfully available to, the receiving party from a source, other than the disclosing party or its representatives who are not prohibited from disclosing such portions to the receiving party..." or was "independently developed by it or its representatives without any use of or reliance on any information." *Id.* at par 6 (a)-(b).

35. Once the confidentiality agreement was executed, the parties exchanged preliminary financial due diligence. WK sent SDI a "Summary Business Plan," which included various financial projections for SHA. WK projected that SHA would have $158 million in revenue and negative $2.8 million in EBITDA in 2010. PX-12.

36. SDI also sent WK financial projections for SDI. SDI projected $145 million in revenue and $24 million in EBITDA in 2010. PX 13.

IV. Plaintiffs receive two offers in August 3-6, 2010

37. On August 3, 2010, SDI submitted a preliminary non binding indication of interest to acquire SHA. PX-16.

38. The offer from SDI valued SHA at $110 million and was subject to the completion of due diligence. PX-16; N.T. 9/23/13 a.m. p. 78 (Satin).

39. On August 6, 2010, WK received an offer from Symphony Technology Group ("Symphony"), a private equity company, of $120 million. PX 17-STG 000286; N.T. 9/23/13 a.m. p. 77 (Satin).

40. Symphony proposed to buy 51% of the business which translated to $61.2 million, $40 million in cash and $21.2 million in the form of a subordinated note. *Id.*

41. Although the Symphony offer was very attractive, WK chose the SDI offer because it proposed a combination of SHA and SDI to create a new company that would be able to better compete against IMS. N.T. 9/23/13 a.m. p. 80-81 (Satin).

42. WK and SDI agreed to a higher purchase price than noted in SDI's initial indication of interest, which would be incorporated into a nonbinding letter of intent. D-0395 at WBSDI00000007.

V. SHA and SDI enter into Exclusivity Agreement

43. On September 17, 2010, the parties executed a Letter of Intent (LOI) containing a non-binding term sheet outlining the terms of the deal. No obligation existed with respect to any transaction unless and until there was execution of definitive and ancillary documents typical for transactions of this type. PX-23; N.T. 9/23/1.3 a.m. p. 82 (Satin).

44. The parties acknowledged and agreed the transaction was subject to satisfactory completion by each party of a due diligence review. *Id*

45. The LOI contained an exclusivity provision. Upon

execution, the parties agreed to immediately cease any discussions or negotiations with any third party that may be ongoing with respect to a "Potential Transaction"[3]. *Id.*

46. The parties also agreed for a period of forty five (45) days not to:

(a) initiate, solicit or knowingly encourage any inquires or the making of any proposal regarding any potential transaction; (b) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any information or data to any third party relating to any potential transaction; (c) enter into any agreement or agreement in principle with respect to an proposed transaction; or (d) otherwise facilitate any effort or attempt to consummate a potential transaction...PX023.

47. The forty five (45) day exclusivity period ran from, September 18, 2010 through and including November 1, 2010. In accordance with the agreement, the exclusivity period could be extended for an additional thirty days, through and including December 1, 2010, "if the definitive documentation for the transaction" had not yet been executed and "the parties are continuing to proceed with the negotiation of such definitive documentation in good faith." PX-23.

48. The exclusivity agreement also contained a notice provision, which stated:

During the exclusivity period, each of the company parties and the SDI Parties shall advise the other of

---

3. "Potential Transaction" is defined by the agreement as any merger, joint venture, partnership, consolidation, dissolution, liquidation, recapitalization, reorganization, stock or asset sale, exchange or contribution, business combination, financing or similar transaction outside the ordinary course of business. *Id.*

any inquiries by any third party with respect to any potential transaction and shall provide the material terms (excluding the identity of such third party) of any proposal received, in each case within one (1) business day thereof. *Id.*

49. The agreement also incorporated by reference the May 6, 2010 confidentiality agreement as follows:

The contents of this letter and the existence of any discussions between the SDI Parties and the company parties shall constitute information as such term is defined in that certain mutual nondisclosure letter agreement, dated as of May 6, 2010, by and among Wolters Kluwer U.S. Corporation, SDI and LLR Partners, which such agreement shall govern this letter and the actions of the SDI Parties and the company parties pursuant hereto. *Id.*

VI. Events after Exclusivity Agreement signed

50. After the exclusivity agreement was signed, full due diligence began. N.T. 9/23/13 a.m. p. 89 (Satin).

51. The purpose of the due diligence was to determine whether the projected synergies between SHA and SDI "were real and realizable" and whether the proposed terms of the deal were "appropriate." *Id.* p. 92.

52. Procedures were put in place to keep the data agreements as protected as possible. The agreements were placed in an electronic clean room and certain individuals were provided with access to the other's data agreements. N.T. 9/23/12 a.m. p. 94-95 (Satin). SDI's designee was Kress and WK's designee was Michelle Wolker. N.T. 9/23/13 a.m. p. 94-95 (Satin).

53. On October 15, 2010, SDI provided WK with

revised financial projections for SDI which were "dramatically" different from what they had originally presented a few months prior. N.T. 9/23/13 a.m. p. 98 (Satin). When questioned by Satin, Reuter responded that the original numbers upon which the terms of the deal had been negotiated were SDI's "stretched target numbers" and that SDI's "actual numbers" were the ones being disclosed now. *Id.* at 99.

54. Despite the numbers, WK continued to be interested in the deal because of the potential for value to be created through synergies and because they believed in the combination and its potential for competing better against IMS. N.T. 9/23/13 a.m. p. 103 (Satin).

55. WK was lead to believe that SDI was interested in the deal on the basis of continued positive feedback they were receiving from SDI throughout the due diligence period. N.T. 9/23/13 a.m. p. 101(Satin).

56. On October 20, 2010, after SDI finished with their financial due diligence review of SHA, Reuter called Satin and stated that SDI believed the "strategic fit" was equal or better than they hoped. PX34.

57. WK told SDI that they needed to dig deeper into SDI's numbers before going to the WK Board to seek final approval based on the lowered projections and to date the fact that not much digging had been done. N.T. 9/23/13 a.m. p. 104 (Satin). In response, Reuter told Satin "if you want to do more digging on us, we're going to require more digging on you." *Id.* N.T. 9/23/13 a.m. p. 103-104 (Satin).

58. On October 23 and 24, 2010, Kress received access to SHA's confidential data agreements. N.T. 9/23/13 a.m. p. 104-105 (Satin).

59. On October 26, 2010, Kress met with Becker to hear from him how due diligence was going. PX-40. The dinner was "fine and friendly" and Kress did not raise any "troubling revelations from his review" of the data agreements. *Id.*

60. The following morning, Kress emailed Becker to thank him for dinner and to advise that he would like to finish due diligence by the end of that week. PX-44.

61. Satin was surprised by the response since WK was still waiting for more financial due diligence from SDI. Satin emailed Becker: "Well its odd given that we don't have their stuff in data room yet." *Id.* Becker replied, "He is just saying let's just be done with all this and do the deal!" *Id.*

## VII. IMS and SDI Contacts

62. IMS was interested in SDI because of its strength in the anonymized patient longitudinal data (APLD) market and the significant cost synergies a combined IMS/SDI would offer. N.T. 9/26/13 p. 81, 106 (Linn).

63. In 2005, IMS made an offer to acquire SDI, prior to its Verispan acquisition, but the two companies could not agree on a price. N.T. 9/26/13 a.m. p. 28-30 (Linn).

64. After LLR's investment in SDI, Bill Nelligan, President of IMS America, approached Howard Ross, a partner at LLR, to establish a professional relationship and to discuss the LLR portfolio companies that IMS might be interested in acquiring if an opportunity arose. N.T. 9/19/13 p.m. p. 90-93 (Ross).

65. In February 2010, IMS, a formerly public company was taken private with TPG a private equity group, purchasing the largest stake of the company.

66. After taking IMS private, TPG recruited and hired Ari Bousbid from another industry. Bousbid took the position of CEO on September 1, 2010.

67. Bousbid, new to the health care industry reached out to Bob Becker, CEO of Wolters Kluwer Health in October 2010. N.T. 10/1/13 a.m. p. 10 (Bousbid).

68. In September and October 2010, IMS heard rumors of SHA/SDI negotiations through several sources including Cafe Pharma. N.T. 9/26/13 a.m. 55-65 (Linn); D-0275.

69. By October 27, 2010, the rumors intensified, reaching Europe. Stefan Linn, Senior Vice President of Strategy for IMS and a former TPG employee emailed two of his former colleagues at TPG, Jeff Rhodes and Todd Sisitsky: "There are persistent rumors that SDI is acquiring the WK assets. Have you heard anything? That would not be good for us. It would create a pretty good solution in the market place with better assets than IMS in the growth markets..." PX-45. N.T. 9/26/13 a.m. p. 66 (Linn).

70. Linn also forwarded his query to Bryan Taylor, another IMS board member. Taylor stated he had not heard the rumors but he was having dinner that evening with a former senior executive at WK. After his dinner, Taylor sent a follow up email to Mr. Linn stating the rumor was confirmed at his dinner and that the structure of the SHA/SDI transaction was a joint venture. This email was forwarded to Bousbid. D-0298, D-0309.

71. Sisitsky responded to Linn at 7:06 p.m. that evening and added Sharad Mansukani, a board member of IMS and employee of TPG Capital the private equity firm that principally owns IMS, to the email: "I have heard nothing to that effect but not sure I would. I was under the

impression that dave [sic] had a dialogue with wk folks. Shard may also know sdi folks (sharad?). PX-45.

72. "Dave" referred to David Carlucci, the former CEO of IMS, who had in fact contacted Becker a few weeks earlier "to fish for information." PX-41.

73. The same day that Linn emailed Rhodes and Sisitsky, October 27, 2010, Kress reached out to Mansukani and invited him to dinner, "So, dinner again soon?" PX-42. Mansukani responded at 5:08 p.m, "Luv too [sic]...will get u dates." PX-43.

74. Mansukani had dinner with Kress on prior occasions. On July 22, 2010 for instance, Kress told Mansukani that he would be "ready to contemplate a sale" of SDI in the future and that he saw IMS as a "logical buyer". PX-15. Mansukani "told him to give [IMS] a buzz" if any "specific opportunities" presented themselves. *Id.*

75. On October 27, 2010 at 7:17 p.m., Mansukani responded to Sisitsky's email, with a copy to Linn and others: "I had not heard anything either-however+ironically 3 hrs ago-the ceo at SDI (andrew kress) shot me an email and asked me when I was free for dinner...have not seen/ heard from for last 3 mos." PX-45.

76. At 7:31 p.m., Mansukani sent a new email to Kress: "So my old philly friend-rumors abound about you and an impending acquisition...Good for you-clearly you want to make we [sic] work to grow our latest acquisition." PX-50.

77. At 7:45, Kress replied: "Should I take that as a yes you'll have dinner next week?" PX-50.

78. Mansukani responded to Kress two minutes later, at 7:47 p.m., "Lol-know [sic] I know why I like you. That's a yes." *Id.* Mansukani then immediately forwarded this

exchange to Linn and stated: "FYI-oh [sic] sounds like our concerns are well founded." PX-47.

79. At 8:31 p.m. on October 27, Linn forwarded the Mansukani/Kress exchange to Bousbid. PX-47. Linn wrote to Bousbid, "FYI-there seems to be some credence to the WK/SDI rumor...Let me think more about what this means." *Id.*

80. Linn emailed his staff at 8:58 P.M. that evening: "I have it from a pretty good source that there is something to the rumor. Can we do an assessment of this asap." PX-48.

81. At or about the same time, a member of TPG and a former unidentified executive of WK confirmed the rumor of a SHA/SDI combination.

82. In the meantime, Kress forwarded the email exchange with Mansukani to Ross. PX-46. Ross responded "thanks, I guess I will not need to make the "the window is closing comment." PX-46.

83. In response to Kress email, Ross replied, "Apparently not. I'm having dinner w him [Mansukani] next week in any case." *Id.*

84. Mansukani's email prompted Kress to email Becker on October 28, 2010 and alert him that SHA/SDI negotiations were now public knowledge. Becker did not respond to Kress until November 3, 2010. PX098; PX087.

85. While the various email transactions were occurring, on October 27, 2010, IMS put together an analysis of the potential SHA/SDI combination. At 11:21 p.m., Hossam/Sadek of IMS circulated "an assessment of the combined data assets" of a SHA/SDI entity and how it would compare to IMS. PX-51. Sadek wrote: "As you can see the combination is [a] more powerful full line

competitor offering a complete set of offering [s] under the same roof." *Id.*

86. On October 28, 2010, IMS presented a hurriedly prepared slide deck at its board meeting, entitled "Overview of SDI and WK combination." PX-53; PX-134.

### VIII. Events of October 29, 2010-SDI encourages interest from IMS

87. Mansukani emailed Kress to suggest Kress meet with IMS's new CEO, Bousbib. PX056. Kress agreed to meet Bousbib, and the two subsequently scheduled a meeting for November 2. PX071; 10/1/13 a.m. 22:8-13 (Bousbib). Mansukani suggested that the two would have a great deal to talk about. PX-57.

88. At 8:24 a.m. Masukani emailed Ross and wrote, "Expect some traffic from IMS folks." Ross forwarded same to Kress and Reuter, commenting: "Interesting...." PX 58.

89. At 8:55, a.m., Nelligan emailed Ross to move up their breakfast from November 10 to November 2, 2010. Nelligan once again stated he thought IMS was a natural landing spot for SDI and wanted to speak to him about this. PX 63. Nelligan also informed Ross that Bousbid would also be in town and was interested in meeting with Ross. *Id.*

90. Ross forwarded the Nelligan email to Kress and Reuter saying, "More interesting...they clearly know what is up...I will meet with them on 11/2. *Id.*

91. Ross' email exchange with Nelligan violated the exclusivity agreement since SDI was knowingly encouraging inquiries into a potential transaction with IMS.

92. Kress also wanted to schedule a meeting with Bousbid for the same day as the Ross meeting. PX-71.

93. Kress' agreement to meet with Bousbid was also a violation of the exclusivity agreement for knowingly encouraging a potential transaction with IMS.

94. While the email exchanges were occurring between SDI and IMS, SDI and WK extended the exclusivity period from November 2 to December 1. PX-62.

95. Edward Spaniel, SDI's general counsel, testified SDI was concerned that if the exclusivity period was not extended, SHA may re-engage negotiations with Symphony. N.T. 9/27/13 p. 38-40 (Spaniel).

96. SDI's extension of the exclusivity period was self-serving.

97. On October 30, 2010, Reuter responded to Ross' "more interesting" email and said, "I think you know the story line. Good luck." PX-67.

XI. November 2, 2010 Meetings and Breaches of the Exclusivity Agreement

98. IMS made an indication of interest on November 2, 2010. N.T. 9/24/13 p.m. p. 137; PX-134-IMS-0028169.

99. Ross disclosed to Bousbid that SDI was under a period of exclusivity with WK until December 1, and therefore they were unable to openly negotiate until the exclusivity period was over. N.T. 9/20/12 a.m. p. 28-29 (Ross); PX-134-IMS-0028169.

100. During the Kress/Bousbid meeting, Kress informed Bousbid that SDI was going to continue to grow and become a major force in the industry. N.T. 10/1/13 a.m. p. 24 (Bousbid).

101. After the meetings on November 2, 2010, Bousbid reiterated IMS's interest in acquiring SDI. PX 75; N.T. 9/24/13 p.m. p. 112 (Kress).

## X. SDI discloses IMS interest to SHA

102. On the evening of November 2, 2010, Edward Spaniel, general counsel for SDI, convened an unscheduled meeting with the board of SDI. PX-79. At this meeting, Spaniel advised the board of two options, one was to ask WK for relief from exclusivity and pursue the IMS deal now and second was to delay the negotiations with WK through November and then validate the IMS deal as soon as exclusivity expires. N.T. 9/20/13 a.m. p. 46, 47 (Ross). The board chose the second option; validate the IMS inquiry as soon as exclusivity expired. N.T. 9/20/13 a.m. p. 47, 50 (Ross); N.T. 9/24/13 p.m. p. 148 (Kress).

103. On November 3, 2010, SDI delivered verbal and written notice of a third party's interest to WK. PX085, PX087. Reuter called Satin to explain that SDI received an unsolicited expression of interest by phone call. He further explained that SDI was not pursuing the inquiry. PX 85; N.T. 9/19/13 p.m. p. 48:2-17 (Reuter); N.T. 9/23/13 a.m. p. 111:7-18,114:16-115:2 (Satin).[4]

104. Spaniel also left Deidra Gold, general counsel for WK North America, a voicemail about the inquiry and subsequently sent her a letter in which he informed her that "[n]o proposal was made by the third party nor were any terms or conditions of the potential transaction discussed." PX 87.

105. On November 3, 2010, Kress called Becker and

---

4. Reuter admitted that he kept notebooks of conversations and meetings during the relevant period but that he destroyed them even though SDI anticipated being sued by WK. N.T. 9/19/13 a.m. p. 104-106 (Reuter).

made similar representations. N.T. 9/24/13 a.m. p. 27 (Becker). Kress told Becker not to worry about the inquiry SDI received because SDI had no interest in it and wanted to get the deal done with WK. *Id.* at 28.

106. The third party referenced by SDI to WK was IMS.

107. Reuter also informed Satin that they were not interested in pursuing the expression of interest by the third party and was simply a phone call expressing interest. PX 86.

108. SDI statements of noninterest were false since SDI was considering a combination of an IMS and SDI combination and desired more time to consider the benefits of same.

109. WK believed SDI and continued pursing the SHA/SDI merger. N.T. 9/23/13 a.m. p. 115 (Satin); N.T. 9/24/13 a.m. p. 28 (Becker).

110. In the meantime, SDI slowed its movements on the SHA deal and began preparing to work towards a deal with IMS upon expiration of the exclusivity agreement.

111. On November 2, 2010, one day after extending exclusivity, SDI's CFO Ellen Purdy prepared at Ross' direction a one page detailed spreadsheet of SDI's financial figures to be provided to IMS. PX-104, PX-105.

112. Satin testified that if plaintiffs knew the truth, they would have immediately terminated negotiations with SDI and returned to Symphony to pursue that alternative. N.T. 9/23/13 a.m. p. 117 (Satin).

113. On November 3, 2010, Kress acknowledges the necessity to keep WK engaged in the transaction until the end of the month. PX 84, PX 85.

114. On November 4, 2010, Kress left Mansukani a voice message. Before responding to Kress, Mansukani reached out to Bousbid to determine the best way to respond to Kress' voice message. PX-91.

115. On November 15, 2013, WK received word from their outside counsel that SDI was delaying revisions to legal documents. Satin emailed Reuter and questioned him about the delay. Satin asked if the delay was intentional. Reuter responded, he did not think there was a delay but they were coming up for air now on diligence and customer and data contracts. N.T. 9/23/13 a.m. p. 120 (Satin); PX-100.

116. Reuter's response deliberately caused Satin to believe the SDI was still interested in a deal with SHA.

117. On November 19, 2010, Spaniel sent an email stating that SDI would revisit with IMS at the end of the month. PX103.

118. During the week of November 22, 2010 and November 29, 2013, spreadsheets were reviewed and edited by Kress, Reuter, Ross and another owner of SDI. PX 104, 105.

119. On November 29, 2010, Spaniel sent another email explaining that WK was making it tough to "slow roll" the deal. PX 110.

### XI. WK working toward a deal with SDI; SDI working toward a deal with IMS

120. After SDI provided WK with notice of the IMS inquiry, WK continued to work on both financial diligence and legal documentation. N.T. 9/26/13 p.m. p. 74:7-76:4 (Spaniel); N.T. 9/24/13 a.m. p. 29:14-30:21; 38:19-23 (Becker); D-0718.

121. After completing its due diligence on SDI and receiving a quality of earnings report from PWC ("Price Waterhouse Coopers"), WK concluded that it was comfortable enough with SDI to proceed with a deal as outlined in the LOI.

122. On November 19, 2010, WK management presented its findings to its executive board. D-0409.

123. On November 29, 2010, Ann Riposanu of WK, a former corporate lawyer with extensive deal experience, wondered if SDI was "having second thoughts" and "getting cold feet" with SHA's compensation and targeting business due to the fact that SDI had received an inquiry from a third party. D-0437; N.T. 9/24/13 a.m. p. 121:9-23 (Becker).

XII. December 1, 2010- Exclusivity with IMS

124. On November 30, 2010, SDI declined to extend exclusivity with WK, leaving exclusivity to expire December 1, 2010. N.T. 9/25/13 a.m. p. 38:10-41:8 (Kress); N.T. 9/26/13 p.m. p. 66:16-68:8 (Spaniel).

125. On December 1, 2010, an SDI board member, Walter Malcolm emailed Kress, "It is Dec 1st...I believe the 'no shop' with WK has now expired. Any word from IMS?" PX-115.

126. On December 1, 2010, Nelligan called Ross. Ross told Nelligan there was a short window of opportunity to come up with an offer before SDI re-engaged WK. PX-134-IMS0028169. Nelligan told Ross they need to get a non-disclosure agreement in place before price could be negotiated. N.T. 9/20/13 a.m. p. 78 (Ross).

127. Ross called Spaniel and asked for a non-disclosure agreement to be sent to Nelligan. Spaniel informed Ross the exclusivity with WK ran through midnight December

1, 2010. N.T. 9/20/13 a.m. p. 79 (Ross).

128. On December 1, 2010, Kress told Becker that he was quite nervous about SHA's 2011 revenue numbers. N.T. 9/24/13 a.m. p. 96:9-97:13 (Becker). Kress feared that SHA was facing up to $27 million in operating losses and expressed this to Becker. Becker was "planning for the event that this deal doesn't happen." D-0442. However, he asked to have a meeting to go through due diligence and get an update on the forecast on December 7, 2010. N.T. 9/24/13 a.m. p. 32-34 (Becker).

129. Satin interpreted SDI's decision not to extend exclusivity to be a deal tactic. N.T. 9/23/13 a.m. p. 121 (Satin).

130. Spaniel waited until midnight on December 1, 2010 to begin preparing a non-disclosure agreement ("NDA") to send to IMS. N.T. 9/27/13 p. 60. Spaniel sent a signed copy to Ross and Kress at 12:38 a.m. on December 2, 2010. PX-119. At 6:02 a.m., Ross responded that he received it. *Id.* Ross then forwarded the NDA to Nelligan. PX 121.

131. Ross attached to the fully executed NDA a one page financial summary and synergy analysis which had been prepared in November to Nelligan. N.T. 9/20/13 a.m. p. 105 (Ross).

132. In the meantime, SDI continued to string SHA along. On December 7, 2010, SHA and SDI met to discuss concerns raised in the KPMG report. At that meeting, plaintiffs provided SDI with an update on SHA's confidential budget projections for 2011, an update on SHA's confidential negotiations with data suppliers and even information about SHA's strategic plans to compete with IMS. N.T. 9/24/13 a.m. p. 36-37 (Becker).

133. Becker reported on the December 7 meeting, stating that Kress "remain[ed] somewhat skeptical" of SHA's revenue forecast, "[u]ntil the [data supply] contracts are concluded, they will remain an uncertainty to Kress"; and Kress expressed concern that a combined SDI/SHA entity "might have to fund as much as $20-25 million in negative cash flow in the first half of the year" and that they may not be able to get sufficient bank funding for this. PX131.

134. At the conclusion of the meeting, Kress stated they would need a few days to digest the information provided and would get back to WK early next week regarding a go/no go decision. PX 138.

135. At no time did Kress and Purdy reveal to Becker that SDI had re-engaged with the party who had made the unsolicited inquiry on November 2 and were hoping those contracts would result in a substantial offer. N.T. 9/25/13 a.m. p.43-44 (Kress).

### XIII. Consummation of the Deal with IMS

136. At the December 9, 2010 IMS board meeting, the IMS Board authorized Bousbid to pay $340 million to acquire SDI. N.T. 9/26/13 a.m. p. 75 (Linn). The board was willing to give Bousbid authority up to 400 million. *Id.*

137. That evening, IMS opened negotiations with an offer of $275 million. N.T. 9/20/13 a.m. p. 109 (Ross).

138. Bousbid and Ross discussed the offer at about 6:30 p.m. Ross rejected the offer. PX 136.

139. Ross informed Bousbid that SDI had a great deal on the table, referring to SHA, and he thought they could grow the EBITDA at least three times. N.T. 9/20/10 a.m. p. 112 (Ross).

140. Later that evening, Ross contacted Bousbid and stated that the $275 million was a non-starter. SDI was now in the 9th inning with the other party; Ross felt as though they were acquiring a good but poorly managed asset at a very good value and they would take it to completion.

141. On December 10, 2010, Linn emailed Bousbid in response to SDI threats about the other deal. Linn stated a deal between SHA and SDI was not good for IMS.

142. On December 10, 2010, IMS increased the offer to $340 million. PX-138.

143. On December 13, 2010, Colucci emailed Kress regarding the $340 million price and wrote, "Of course they have wind of WK...to suggest anything different is ludicrous!" PX-152. Colucci also responded that this was a great deal no matter what. *Id.*

144. On December 17, 2010, Kress called Becker and said SDI would like to "put the pencils down for a few weeks and then revisit again in the New Year." Becker responded, "if we didn't proceed now, it would not happen and [he] wanted to make sure that [sdi] board understood that." PX-165.

145. On December 21, 2010, Kress called Becker and informed him that they could not do the deal unless WK would consider providing a working capital loan. PX-170. Becker responded that WK was willing to consider the idea in principle, depending on the parameters that Kress had in mind. N.T. 9/24/13 a.m. p.64 (Becker).

146. Kress indicated he would check with the board and get back to Becker. *Id.* at 65.

147. In the meantime, IMS and SDI worked to complete the deal.

148. On January 1, 2011, Ross sent an email to his colleague regarding the purchase price. Ross explained that they would never see this high a valuation again and the deal needed to happen. PX-195.

149. On January 3, 2011, Becker emailed Kress on the status of the working capital loan idea. PX-197.

150. Kress forwarded the email to the SDI board and again asked them for advice on what he should say to Becker. PX 196.

151. After receiving input from the SDI board, Kress responded to Becker on January 4, 2011 stating he apologized for the delay but indicated it would likely take another week to speak to the board to obtain a definitive answer, even though Kress was corresponding with the board about the IMS deal. PX-197.

152. On January 7, 2011, after not having received a response, Satin emailed Reuter and asked for an update. PX202.

153. On January 9, 2011, the IMS "media statement" announcing IMS's acquisition of SDI had already been prepared and circulated between IMS and SDI. PX-205. Kress never contacted SHA to say the deal was off. N.T. 9/25/13 p.m. p. 16-18 (Kress).

154. On January 10, 2011, Becker sent an email advising Kress that WK will be sending formal termination notice regarding the deal discussions. PX-206.

155. On January 13, 2011, IMS and SDI signed an asset purchase agreement, in which IMS agreed to pay the agreed purchase price to SDI Health Holdings in exchange for its equity interests in SDI Health. *See* PX217, PX216.

156. The asset purchase agreement provided for two

escrow amounts, $30 million for general indemnity, and $20 million for the divestiture required by the FTC. Both escrow funds have been distributed. IMS is not holding any portion of the purchase price. PX-217; 9/19/13 AM N.T. at 4:18-9:13 (Reuter).

## XIV. SDI/IMS merger effects on SHA

157. The IMS/SDI acquisition caused a large impact on SHA's marketability and it became almost impossible for SHA to compete in the small healthcare analytics market space. N.T. 9/24/13 a.m. p. 71 (Becker).

158. SHA would have moved forward with the Symphony offer but for the SDI deal. N.T. 9/23/13 a.m. p. 81 (Satin).

159. WK sold SHA to Symphony in 2012, eighteen months later, for a net value of $37.5 million. N.T. 9/23/13 p.m. p. 5 (Satin). The deal involved no cash only stock. N.T. 0/24/13 a.m. p. 72-73 (Becker).

## XV. Procedural History

160. On February 28, 2011, plaintiffs instituted the instant action against defendants by writ of summons.

161. On March 1, 2011, plaintiffs filed a complaint against defendants SDI Health LLC, SDI Health Holdings, LLC, SDI Holdings Inc., LLR Partners Inc. and Andrew Kress.

162. The complaint alleged causes of action for breach of the confidentiality agreement, breach of the exclusivity agreement, actual and threatened misappropriations of trade secrets pursuant to 12 Pa. C. S. A. section 5301-5308, improper procurement of information pursuant to Restatement (First) of Torts section 759, fraud, negligent misrepresentation and common law unfair competition.

163. On April 25, 2011, defendants filed preliminary objections to the complaint.

164. On June 15, 2011, the preliminary objections filed by the LLR defendant were sustained and LLR was dismissed as a defendant. Additionally, the preliminary objections filed by defendant Kress and SDI were overruled.

165. On July 7, 2011, plaintiffs filed an amended complaint. All the defendants remained the same except defendant SDI Health Holdings, LLC was dismissed as a defendant.

166. The amended complaint alleged claims for breach of an exclusivity agreement, breach of the confidentiality agreement, fraud, negligent misrepresentation, actual and threatened misappropriation of trade secrets, improper procurement of information, and unfair competition against all defendants.

167. On November 29, 2011, the court granted IMS' petition to intervene by stipulation.

168. On January 13, 2012, the court granted a motion to stay proceedings pending mediation.

169. On June 18, 2012, the stay was lifted and a revised case management order was issued.

170. On April 12, 2013, defendants' motion for summary judgment was granted in part and denied in part. The court granted the motion as it pertained to the measure of damages sought by plaintiffs, specifically $180 million only and denied the motion as to the claim for damages for $62.9 million and $32.4 million.

171. The case proceeded to a non-jury trial from September 18, 2013 until October 2, 2013.

172. On October 25, 2013, the parties submitted their findings of fact and conclusions of law.

173. On November 6, 2013, the court heard the parties' closing arguments.

## DISCUSSION

A. SDI breached the confidentiality and the exclusivity agreements.

In count I and II of the amended complaint, plaintiffs allege breaches of the exclusivity agreement and the confidentiality agreement. Upon review of the record, the court finds that SDI did breach these agreements and plaintiffs are entitled to an award of damages as a result of same.

The exclusivity agreement entered into between plaintiffs and SDI specifically prohibited defendants from engaging in any of the following conduct during the designated exclusivity period:

> "(a) initiate, solicit or knowingly encourage any inquiries or the making of any proposal regarding any Potential Transaction; (b) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any information or data to any third party relating to, any potential transaction; (c) enter into any agreement or agreement in principle with respect to any [potential] transaction; or (d) otherwise knowingly facilitate any effort or attempt to consummate a Potential Transaction. PX-23.

SDI's conduct from October 29, 2010 to December 1, 2010 was in direct violation of the exclusivity agreement's prohibitory terms. Specifically, Ross' acceptance of an invitation to meet IMS CEO, Bousbid on November 2,

2010, and his attendance at the actual meeting constituted a breach. Ross knew at the time the invitation was accepted that IMS was interested in acquiring SDI. In fact, the email inviting Ross to meet expressed unequivocally IMS' longtime desire to acquire SDI and designated IMS as the "natural landing spot for SDI." PX-64. Accepting the invitation and attending the meeting with the knowledge that IMS had a desire to acquire SDI, was a violation of the exclusivity agreement by knowingly encouraging IMS to propose a transaction between SDI and IMS. Indeed, IMS asked to acquire SDI during the November 2, 2010 meeting, N.T. 9/20/13 a.m. p. 25-26 (Ross), which constitutes another breach of the agreement.[5]

Additionally, Kress' acceptance on October 31, 2010 of an invitation to meet with Bousbid independent of Ross also constitutes a breach of the exclusivity agreement. PX-71. Like Ross, Kress was well aware of IMS' desire to acquire SDI and therefore, Kress' acceptance of the invitation to meet encouraged IMS to propose a transaction between SDI and IMS. Predictably, during the meeting with Bousbid a proposition was made to acquire SDI which SDI agreed to consider once exclusivity with WK expired. PX-134-IMS0028169.[6] SDI, not only breached the exclusivity agreement by accepting an invitation to meet with IMS and attend the meeting, but SDI also breached the confidentiality provision contained within the exclusivity agreement by disclosing that they were in an exclusivity period with WK and that the exclusivity

---

5. On December 1, 2010, Ross breached the exclusivity agreement by contacting Nelligan and informing him that a "small window of opportunity" existed for IMS to come up with a compelling offer. PX-134.

6. Additionally, Kress' attempt to contact Mansukani on November 4, 2010 also constituted a breach of the exclusivity agreement. Kress acknowledged that his attempt to contact Mansukani on November 4, 2010 was a "bad idea." N.T. 9/24/13 a.m. p. 138 (Kress).

period ran until December 1. *Id.*[7]

In addition to breaching the exclusivity agreement, SDI also breached the May 6, 2010 confidentiality agreement. The confidentiality agreement prohibited SDI from disclosing the fact, nature or status of any discussions among the parties or any other facts or information with respect to the nature, terms or status of any transaction among the parties. PX-11 par 3 (d). SDI disclosed to IMS that they were in a period of exclusivity with SHA until December 1, PX134 and that they had a great deal on the table with SHA that was in the "9th inning" with SHA.[8] Said disclosures constituted a breach.

Lastly, SDI breached the implied duty of good faith and fair dealing in the exclusivity agreement and the confidentiality agreement. Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement.[9] Good faith has been defined as "honesty in fact in the conduct or transaction concerned."[10] SDI breached the duty of good faith and fair dealing by renewing the exclusivity agreement solely to

---

7. The email exchange that occurred between the parties on October 27, 2010 does not constitute a breach of exclusivity agreement. The court is not convinced that the exchange between Mansukani and Kress was a "nod and wink" confirming the existence of a potential transaction between SHA and SDI. Evidence exists that rumors existed in the industry that such a transaction was occurring. As such, the court can not conclusively determine if the email exchange confirmed the existence before the rumors were confirmed.

8. Plaintiffs also argue that the email exchange of October 27, 2010 constitutes a breach of the confidentiality agreement. For the reasons discussed in footnote 7, the court can not conclusively determine if the email exchange confirmed the existence before the rumors were confirmed.

9. *Kaplan v. Cablevision of Pa., Inc.*, 448 Pa. Super. 306, 671 A.2d 716, 722 (1996), *appeal denied*, 546 Pa. 645, 683 A.2d 883 (1996), citing, *inter alia, Somers v. Somers*, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (1992), *appeal denied*, 533 Pa. 652, 624 A.2d 111 (1993); *Capitol v. Antaal*, 972 N.E. 2d 1238, 1246 (Ill. App. Ct. 2012).

10. *Kaplan*, 671 A.2d at 722.

effectuate the engagement, validation and completion of a deal with IMS. SDI's conduct from November 1, 2010, the first extension of the exclusivity agreement, until January 13, 2011, the date IMS and SDI signed the asset purchase agreement, was in bad faith and for the sole purpose of creating leverage in IMS' negotiations. SDI's conduct is a prime paradigm of evasion of the spirit of the bargain.

Having found that SDI breached the exclusivity agreement and the confidentiality agreement, the court must address the issue of damages. Under Pennsylvania law and Illinois law, the party alleging a breach of contract has the burden of proving damages resulting from the breach.[11] Damages must be established with "reasonable certainty" and may not be recovered if they are too speculative, vague or contingent.[12] Proof of the exact amount of loss or a precise calculation of damages, however, is not required as long as the evidence "with a fair degree of probability" establishes a basis for the assessment of damages.[13]

As damages, plaintiffs seek disgorgement of all profits generated by SDI from its merger with IMS and characterize same as restitution damages. Restitution damages are one of three distinct theories of damages to remedy a breach of contract.[14] Expectation damages are

---

11. *Spang & Co. v. U.S. Steel Corp.*, 519 Pa. 14, 545 A.2d 861, 866 (Pa. 1988).

12. *Id.*

13. *Id.* quoting *Aiken Indus., Ind. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808,812 (Pa. 1978).

14. *Trosky v. Civil Service Comm'n*, 539 Pa. 356, 652 A.2d 813 (Pa. 1995). *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill. App. 3d 6, 14, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006)(A party injured by another's breach or repudiation of a contract usually seeks recovery in the form of damages based on his "expectation interest," which involves obtaining the "benefit of the bargain," or his "reliance interest," which involves reimbursement for loss caused by reliance on a contract. Restatement (Second) of Contracts § 344 (1981). However, where a defendant has committed a total breach or a repudiation of a contract, a plaintiff may alternatively seek restitution. Restatement (Second) of

the preferred basis for contract damages and seek to give the injured party the benefit of its bargain by attempting to place the aggrieved in as good a position as it would have been, had the contract been performed. These damages are measured by the losses caused and gains prevented by defendant's breach, less any savings or other benefits from the defendant's non-performance.[15] Alternatively, an injured party may seek reliance and restitution damages when recovery based on traditional notions of expectation damages is clouded because of uncertainty in measuring the loss in value to the aggrieved contracting party. Reliance damages seek to put the injured party in the position that it would have had, if the contract had never been made and are usually measured by the expenditures made in performance of the contract. Restitution damages, in contrast, seek to prevent one party from being unjustly enriched and are measured by the benefit received by the party subject to restitution. The purpose of restitution damages, like that of reliance damages is to return the plaintiff to the position it held before the parties' contract.[16]

Plaintiffs claim SDI received a benefit from plaintiffs when they unwittingly acted as a stalking horse in the SDI and IMS negotiations. Plaintiffs' expert Dr. Hohan Rao of Navigant Economics opined that SDI was unjustly enriched as a result of their wrongful conduct by, at a minimum, $62.9 million. Using a "but for" analysis, Rao compared the amount of SDI's unjust gains, to what Rao determined was the preemption premium SDI received, using general economic bargaining analysis. After making the various adjustments, Rao took the difference between the actual price and the "but for" price and concluded it was at a minimum $62.9 million. According to plaintiffs

Contracts § 373 (1981)).
15. *Id.*
16. *Id.*

this is the amount to be disgorged.

This court is constrained to find that restitution does not apply in this particular situation. First, plaintiffs are unable to direct this court to any precedent, nor could this court find any precedent, which permits the award of restitution damages to a party to a contract to negotiate, when the negotiation does not result in a deal. If existing as a competitor in the negotiation process could be considered a "benefit" then in the context of every letter of intent with a disappointed bidder, the disappointed bidder would be able to recover damages for a deal to which the parties never agreed. Awarding such damages on a breach of an exclusive agreement to negotiate would be basing damages on prospective terms of a nonexistent contract which could result in the rejection of the contract itself.[17] As such, restitution damages are inappropriate.

Moreover, the court is not persuaded that § 39 of the Restatement of Law 3d, Restitution and Unjust Enrichment (2011) applies to the case at hand. Section 39 discusses restitution damages based on profits from opportunistic breach. According to this section, if a deliberate breach of contract results in profits to the defaulting promisor and the available damage remedy affords inadequate protection to the promisee's contractual entitlement, the promisee has a claim to restitution of the profit realized by the promisor as a result of the breach. Section 39 defines a breach of contract as profitable when it results in gains to the defendant greater than the defendant would have realized from performance of the contract. Profits from the breach include saved expenditure and consequential gains that the defendant would not have realized but for the breach. Section 39 profits are profits realized by the

---

17. *See, Goodstein Constr. Corp. v. New York,* 604 N.E. 2d 1356, 1360-61 (N.Y. 1992).

defaulting party as a result of the breach.[18] Notably, § 39 of the Restatement has not been adopted or applied by any Pennsylvania or Illinois court, consequently, this court is not prepared to apply this section here without an expression of adoption from a higher court.

Plaintiffs are however entitled to reliance damages. Reliance damages will put plaintiffs in the position they would have had, if the agreements had never been made; that is repayment of the expenditures made in performance of the contract. Any other form of damages would provide plaintiffs with a windfall and penalize SDI, neither of which serves the purpose of contract damages. According to the record, plaintiffs expended $1.1 million dollars in attorney fees and preparation of documents in performance of the agreements and hence are entitled to same as damages for SDI's breach of contract. The court finds SDI's post November 1, 2010 conduct deliberately underhanded; even more troubling was the repeated lack of credibility in several witnesses' trial testimony. The court, nonetheless, is limited in the amount of damages it can award based upon the evidence admitted. The court may award either $1.1 million or $62.9 million. Having found the amount of $62.9 million inappropriate for the reasons stated supra, the court is left with the sum of $1.1 million for damages which may be insufficient to make plaintiffs whole as a result of defendants conduct.

B. The claims for fraud and negligent misrepresentation are barred by the gist of the action doctrine.

Plaintiffs argue that SDI committed fraud and made negligent misrepresentations to plaintiffs. As it pertains to fraud, the essential elements require a misrepresentation, a fraudulent utterance thereof, an intention to induce

---

18. Restatement §39 comment f exceptional nature of the claim.

action thereby, justifiable reliance thereon and damage as a proximate result. To be actionable, a misrepresentation need not be in the form of a positive assertion but is any artifice by which a person is deceived to his disadvantage and may be accomplished by false or misleading allegations or by concealment of that which should have been disclosed, but which deceives or is intended to deceive another to act upon it to his detriment.

The elements of negligent misrepresentation are: 1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.[19]

Here, the claims for fraud and negligent misrepresentation are barred by the gist of the action doctrine. The gist of the action doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims.[20] Although mere non-performance of a contract does not constitute a fraud, it is possible that a breach of contract also gives rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral.[21] "In other words, a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and

19. *See Heritage Surveyors & Engineers, Inc. v. Nat'l Penn Bank*, 2002 Pa. Super. 194, *P13, 801 A.2d 1248, 1252 (2002).

20. *eToll, Inc. v. Elias/Savion Adver., Inc.*, 2002 PA Super 347, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).

21. *eToll, Inc. v. Elias/Savion Adver., Inc.*, 2002 PA Super 347, 811 A.2d 10, 14 (Pa. Super. Ct. 2002); *Bash*, 601 A.2d at 829, citing, *Closed Circuit Corp. v. Jerrold Electronics Corp.*, 426 F.Supp. 361, 364 (E.D.Pa.1977).

not by the larger social policies embodied by the law of torts."[22]

Here, the dispute between the parties is based on the exclusivity agreement and the confidentiality agreement. The parties' obligations are deeply intertwined with the obligations imposed by the contracts themselves. As such, the claims for fraud and negligent misrepresentation are redundant and duplicate the claim for breach of contract. Consequently, the claims for fraud and negligent misrepresentation are barred by the gist of the action doctrine and are dismissed.

C. Plaintiffs failed to prove their claim for improper procurement of confidential information.

Plaintiffs assert a claim for improper procurement of confidential information under the Restatement of Torts § 759 which provides that one who advances "a rival business interest" by procuring through "improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information."[23] SDI did not procure plaintiffs' information through improper means. Plaintiffs' information was voluntarily given to plaintiffs. Plaintiffs failed to produce any evidence that any information procured by SDI was improperly procured and used to cause plaintiffs harm. As such, plaintiffs' claim for improper procurement is dismissed.

D. Plaintiffs failed to prove their claim for improper

---

22. *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3rd Cir.Pa.2001), *cert. denied*, 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 116 (2002), quoting, *Bash*, 601 A.2d at 830. *eToll, Inc. v. Elias/Savion Adver., Inc.*, 2002 PA Super 347, 811 A.2d 10, 14-15 (Pa. Super. Ct. 2002).

23. *Pestco, Inc. v. Associated Prods.*, 880 A.2d 700, 708-709 (Pa. Super. 2005).

competition.

Plaintiffs assert a claim for unfair competition. A cause of action for unfair competition exists where the defendant unfairly competes against the plaintiff in a manner that is tortious.[24] Pennsylvania courts "have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things....misrepresentation...and unlawful use of confidential information."[25] Plaintiffs failed to present any evidence to support a claim for improper competition. Any information procured was received by SDI with plaintiffs' knowledge and no evidence was received to support such claim. As such, the claim is dismissed.

## CONCLUSIONS OF LAW

1. SDI breached the exclusivity agreement and the confidentiality agreement by knowingly encouraging inquiries by IMS, by engaging and continuing to participate in discussion with IMS and disclosing the existence of the exclusivity period with SHA and the date of expiration.

2. SDI breached their implied duty of good faith and fair dealing within the exclusivity agreement and the confidentiality agreement by knowingly extending the exclusivity period with SHA while engaging and participating in discussions with IMS and utilizing the existence of a potential SHA potential transaction as leverage against IMS.

3. Plaintiffs are entitled to reliance damages for said breaches in the amount of $1.1 million dollars for attorney

24. *Philadelphia v. Trs. of the Univ. of Pa.*, 2012 WL 1274334 (Pa. Ct. Com. Pl. March 30, 2012); Restatement (Third) of Unfair Competition, section 1 comment g (1995).

25. *Synthes (U.S.A.) v. Globus Med. Inc.*, No. Civ. A. 04-CV-1235 WL 2233441 (E.D. Pa. Sept. 14, 2005).

fees and document preparation.

4. Plaintiffs' claims for fraud and negligent misrepresentation are barred by the gist of the action doctrine.

5. Plaintiffs' failed to prove their claim for misappropriation of trade secrets and improper procurement of confidential information.

6. Plaintiffs' are not entitled to punitive damages on a breach of contract claim.[26]

## FINDING

And now, this 14th day of January 2014, after a non jury trial in this matter, this court finds in favor of plaintiffs Source Healthcare Analytics, Inc., Wolters Kluwer U.S. Corporation, Wolters Kluwer Pharma Solutions, Inc. and Wolters Kluwer Health, Inc. and against defendants on the claims for breach of the exclusivity agreement and confidentiality agreement in the amount of $1.1 million and defendants are ordered to return to plaintiffs any and all confidential and proprietary information that belongs to the plaintiffs immediately.

As for the claims for fraud, negligent misrepresentation, improper procurement of information and unfair competition, the court finds in favor of defendants and against plaintiffs as such these claims are dismissed.

---

26. *Standard Pipeline Coating Co., Inc. v. Solomon & Teslovich, Inc.*, 344 Pa. Super. 367, 375, 496 A.2d 840, 844 (1985)( It has been held that punitive damages will not be assessed for a mere breach of contractual duties, where no recognized trespass cause of action, pleaded by the plaintiff, arose out of the same transaction.); *Mijatovich v. Columbia Sav. & Loan Ass'n*, 168 Ill. App. 3d 313, 315, 522 N.E.2d 728, 730 (1988)(Punitive damages are generally not recoverable for breach of contract except when the conduct causing the breach is also a tort for which punitive damages are recoverable and there are proper allegations of malice, wantonness or oppression.